# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| NING XI, an individual, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | Civil Action 2:17-cv-07316-ES- |
| | : | MAH |
| INSTITUTE OF ELECTRICAL | : | |
| AND ELECTRONICS | : | |
| ENGINEERS, INC., a New York | : | |
| Non-Profit Corporation, and | : | |
| KAREN P. BARTLESON, an | : | |
| individual, | : | |
| | : | |
| Defendants. | | |

## PLAINTIFF'S REPLY IN FURTHER SUPPORT OF
## HIS MOTION FOR CONTEMPT SANCTIONS

If the IEEE really believed it was not enjoined from removing Dr. Xi from the RAS Presidency, it would have simply removed him in October 2017.  End of story.

It would not have tried to circumvent the injunction by surreptitiously advancing a Xi-targeted Bylaw Amendment[1] through a Governance Committee meeting (unbeknownst to the Governance Committee members) before slipping it onto an IEEE Board consent agenda.  What use are smoke and mirrors if the end goal can be achieved directly?

It would not have filed a motion to dissolve the injunction and asked for the motion to be decided "on an emergent basis" because "we still do not want Dr. Xi becoming president of the robotics society."  What's the emergency in dissolving the injunction to allow removal of Dr. Xi as RAS President if the Court's injunction never forbade that action in the first place?

And it would not have argued for a significant injunction bond for the *sole* reason that Dr. Xi's ascension to the RAS Presidency purportedly posed a $1,000,000 risk.  Why ask for a million dollar bond to guard against alleged financial misfeasance if the IEEE could simply remove Dr. Xi from the RAS Presidency

---

[1] The IEEE claims that this Bylaw Amendment was not targeted specifically at Dr. Xi and is "of general application," but as explained in the separately pending briefing regarding the IEEE's motion to dissolve the injunction, that is simply and demonstrably false.  The reality is that the IEEE kept its Board of Directors in the dark on all issues in this case, and tried to sneak through an amendment to remove Dr. Xi without due process and despite the Court's injunction.

1

before the alleged risk even ripened?

If the IEEE truly believed that it was not enjoined from removing Dr. Xi from the RAS Presidency, it would not have done any of these things. It would have simply removed Dr. Xi from the RAS Presidency immediately after this Court issued its injunction.

Of course, the IEEE knows that the Court's injunction is much broader than the IEEE now claims. The Court enjoined the IEEE from conducting *any* special meeting at *any* time to determine Dr. Xi's membership status, which included all of the benefits and rights he enjoys, including his positions on the RAS AdCom Committee and as RAS President. Dkt. #18, at 1; Dkt. #44, at 2.

But on March 2, 2018, IEEE Managing Director of Technical Activities Mary Ward-Callan made clear that she intended that RAS hold *exactly* the sort of "special meeting" forbidden by the Court's injunction:

> We are setting up 2 meetings. … *The second meeting is the special meeting of the RAS. The purpose of this meeting is* (1) to declare Dr. Xi incapable of fulfilling his duties due to his inability to contact any of the RAS leadership (2) to enact the RAS bylaw making the Pres-Elect effectively the Acting President (3) *Removing Dr. Xi from office* and (4) Getting a new president permanently in office.

Ex. A (emphasis added). The IEEE would have this Court believe that when the Court issued an injunction forbidding it from conducting any "special meetings" at "any other time," it did not mean to forbid a "special meeting" in late March to grant the IEEE self-imposed relief that necessitated the injunction in the first instance.

2

Confronted with evidence that IEEE staff initiated, directed, and controlled the RAS "special meeting" to remove Dr. Xi, the IEEE has nothing but a shrug of the shoulders to offer in its defense. "IEEE staff and counsel were obviously involved in the AdCom's decision to hold a meeting to determine whether to remove Xi as RAS President." IEEE Response to Mot to Compel, Dkt. # 135, PageID 3028. "What is so nefarious about that?" asks the IEEE. *Id.*

Well, for starters, the Court expressly forbade such "special meetings" to determine Dr. Xi's membership status in an injunction. Perhaps that's what makes the action of convening a "special meeting" and violating the injunction "nefarious." Or, if a mere violation of the Court's injunction were not enough, perhaps it is the fact that IEEE counsel was telling the Court one thing (urgently requesting a speedy resolution of a motion to dissolve the injunction on the claimed exigency of preventing Dr. Xi from becoming RAS President) while simultaneously doing another (coordinating a special meeting of RAS Membership to grant IEEE the same relief that it had requested from the Court). Either of these would suffice to answer the IEEE's question. There is really no doubt at all that the IEEE conducted a "special meeting" to determine/remove Dr. Xi's membership status as RAS President. The Court should view this conduct as undisputed.

Caught red-handed, the IEEE asks in the alternative to be given the benefit of the doubt that it did not *intend* to violate the injunction. Respectfully, the IEEE does

not deserve this mulligan.  The IEEE knew how to ask for clarification from the Court regarding the injunction.  It even cited its motion for dissolution (which only came after the IEEE had already violated the injunction by passing a Xi-specific amendment) as evidence that it knew to ask for permission rather than beg for forgiveness.  But it did not ask for or receive permission when it came to the RAS Presidency.  The IEEE rolled the dice instead, and gambled that Dr. Xi would be convicted and that the Court might agree that the IEEE's ends justified its means.

But Dr. Xi was not convicted.  The Government's case unraveled, in part, when it became apparent that Dr. Xi spent considerably less on conferences than his predecessors and contemporaries at IEEE; that the IEEE had no instructions, guidance, or controls whatsoever regarding the expense submission process; that some of Dr. Xi's methodologies were not only common, but decidedly more transparent than the methodologies used by others; that the IEEE had taken steps to conceal these realities; and that the FBI investigator himself recognized doubts in the validity of the claims against Dr. Xi.  The Government acknowledged the weakness of its case and dismissed the charges against Dr. Xi with prejudice, and it did so after the Court indicated that it would strongly consider a motion for acquittal.

The IEEE ignores these inconvenient truths.  This Court should sanction the IEEE for its contemptuous conduct and grant the relief requested in Dr. Xi's motion.

**A.      The IEEE Knew It Was Violating the Court's Injunction.**

The IEEE does not explain why it did not remove Dr. Xi from the RAS Presidency in October 2017 if it really believed the injunction did not prevent it from doing so.  It does not explain why it argued that the only economic harm it faced from the Court's injunction arose from its inability to remove Dr. Xi from the RAS Presidency.  Hearing Trans., Dkt. #26, at 67-68.

Instead, what the IEEE absurdly offers instead is that it argued for a significant bond at the TRO hearing because it did not know what relief the Court would ultimately grant.  But that does not explain why — weeks after the hearing and after it knew the terms of the Court's order — the IEEE continued to argue for the bond because of the alleged risk posed by Dr. Xi's assumption of the RAS Presidency. Dkt. #20, at 3-4, 8; Dkt. # 25, at 3, 9.  Presumably by that point — if the IEEE's current rationale is to be believed — it would have known it was fully permitted to remove Dr. Xi from the RAS Presidency at will.  The IEEE's story just doesn't hold up: it knew that the injunction prevented it from removing Dr. Xi from the RAS Presidency and it sought a significant bond to address that risk.

What's more, just over two months after the Court issued the injunction the IEEE continued to complain about its inability to remove Dr. Xi from the RAS Presidency.  The IEEE asked for emergency consideration of a newly filed motion to dissolve the injunction because "we still do not want Dr. Xi becoming president

of the robotics society … IEEE would prefer to have this matter resolved before he assumes the presidency." Dkt. #55, December 15, 2017, Hearing Trans., at 9. Again, the IEEE's current story just doesn't hold up.

The Court should see the IEEE's new position for what it is: subterfuge. The reality is that this Court's order barred the IEEE from holding special meetings to determine or affect Dr. Xi's membership status in the IEEE. Dkt. #18, at 1; Dkt. #44, at 2. RAS is a subordinate division of the IEEE, so it could not meet (especially at the urging and direction of IEEE's counsel) to affect Dr. Xi's membership status in RAS either.[2] IEEE knew this, which is why it did not take any action whatsoever to remove Dr. Xi from the RAS Presidency at any point until after he had been charged. But once Dr. Xi was charged, the IEEE assumed it had already won and could do what it liked.

The IEEE was wrong. "A defendant … does not have 'immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined. Such a rule would give tremendous impetus to the program of experimentation with disobedience to the law…'" *Equinox Software Sys., Inc. v. Airgas, Inc.*, No. 96-3399, 1997 WL 12133 at * 3 (E.D. Pa. Jan. 7, 1997) (*citing McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). The Court's broad

---

[2] IEEE seems to suggest that the RAS Committee acted independently of the IEEE, which is not only impossible, but also untrue, as described below.

injunction forbade the IEEE from taking any action through any of its subordinate divisions to affect Dr. Xi's membership status in any way.  The IEEE violated the injunction by removing Dr. Xi from the RAS Presidency without this Court's permission to do so.  It should be held in contempt and sanctioned as a result.

**B.    There is No Ambiguity Regarding the IEEE's Actions, and the IEEE Offers No Explanation for its Conduct.**

As detailed in Dr. Xi's motion, IEEE staff initiated, directed, and controlled the RAS's determination to remove Dr. Xi from the RAS Presidency.  When a former President of RAS proposed that RAS allow Dr. Xi a leave of absence while his criminal proceedings unfolded, *see* Ex. E, the IEEE quickly intervened to "stop RAS leadership from taking action immediately."  Ex. F.  Indeed, the IEEE had apparently already met and formulated a "plan" for Dr. Xi's removal as RAS President, necessitating Ms. Ward-Callan's immediate intervention to control the RAS Administrative Committee and steer it in the "right" direction.  *Id.* at IEEE00013594. Ms. Ward-Callan instructed the RAS Administrative Committee to cease and desist, and even went so far as to "ask that further communications and action by the RAS AdCom await … input from the IEEE leadership[.]"  Ex. G.

Ms. Ward-Callan then delivered marching orders to the then-RAS President, involved the then-IEEE President, James Jefferies, in a briefing phone call, and delivered the directive that Dr. Xi would need to be removed via a "special meeting" of the RAS Administrative Committee.  Ex. H.  The IEEE made sure to load up the

RAS President with *only* the documents that it wanted the RAS President to see—just the "public documents that have been filed in the criminal complaint[,]" nothing else, and certainly not anything referencing this Court's injunction.  Ex. K.

By March 2, Ms. Ward-Callan reported to IEEE senior leadership that she had indeed set up a "special meeting of the RAS AdCom … [to] remove Dr. Xi from office."  Ex. M.  Indeed, the RAS President made clear to his membership that "The sole business of the Special Meeting is to develop a way forward for the Society in light of the arrest in the United States of the current President of RAS, Dr. Ning Xi."  Ex. N.  In other words, the "special meeting" was about Dr. Ning Xi, no one else.  And the chief agenda item?  "To remove the current RAS President, Dr. Ning Xi, from office."  *Id.*  Once again, acting at Ms. Ward-Callan's direction, *only* the court documents from Dr. Xi's criminal case were forwarded to the RAS Administrative Committee.  *Id.*  Not a single document from *this* case — *let alone this Court's injunction* — was ever referenced or given to the RAS Committee.  The RAS President thought that his actions were legal, as he reported to a concerned member: "This process was suggested by IEEE.  Everything that is not covered by our Bylaws is covered by the IEEE Bylaws."  Ex. N at IEEE00014082.  Then again, the RAS President presumably had no clue this Court had issued its injunction.

On March 30, 2018, the RAS Administrative Committee followed the IEEE's directions and removed Dr. Xi as RAS President.

In its response, the IEEE offers no explanation for its conduct, just a shrug of the shoulders and a veritable "Meh, so what?" First, the IEEE says that its acts are "not relevant to this issue." Dkt. 135 at PageID 3028. That's not true — although the IEEE tries to downplay its conduct by pointing to RAS and arguing that "The Body that Elected Xi as RAS President Removes Him," *see* Dkt # 135, PageID 3016, it neglects to mention its own involvement, encouragement, and leadership in that process. It's not as though some constituent IEEE member acted entirely on her own to alter Dr. Xi's membership status as RAS President. Rather, *it was the IEEE itself* (the restrained party) that initiated this action, directed it, and made sure that it occurred. This not only demonstrates the IEEE's bad faith in toying with the boundaries of this Court's injunction, it also demonstrates clear intent to direct exactly what the Court's injunction forbade — altering Dr. Xi's membership status.

As the IEEE concedes, its "staff and counsel were obviously involved in the AdCom's decision to hold a meeting to determine whether to remove Xi as RAS President." And while the individual members of the RAS AdCom may not have known about this Court's injunction, the IEEE's "staff and counsel" certainly did. This demonstrates their intent — the IEEE knew that this Court had forbidden a "special meeting," but then, after its motion to dissolve was not immediately granted (a motion in which it claimed to this Court the urgent necessity of preventing Dr. Xi from assuming the RAS Presidency), the IEEE proceeded with altering Dr. Xi's

membership status as RAS President on its own anyway.

This segues to the IEEE's next "so what." "Xi suggests that IEEE should have informed AdCom about the injunction, but nowhere does he explain why IEEE had any obligation to do so." Dkt. # 135, PageID 3029. This defiant statement illustrates the IEEE's flagrant misconduct at its worst. To hear the IEEE tell it, it was free to besmirch Dr. Xi's reputation by gleefully reproducing court filings of his arrest, but under "no obligation" to tell the Administrative Committee (members of which had expressed concern about a rush to judgment against Dr. Xi, *see* Ex. L) that this Court had *already issued an injunction forbidding the IEEE from taking action against Dr. Xi*. Perhaps the IEEE and its counsel were under "no obligation" to take basic actions to prevent a violation of this Court's injunction — but if so, they must surely be held accountable for the consequences of those actions, and may not now plead ignorance and cry that they were acting in "good faith" all along. *See* Dkt. # 135 at PageID 3019 (arguing that it had "grounds to doubt the wrongfulness of the conduct" and asking for a presumption of good faith).

No — what happened here was "experimentation with disobedience" of this Court's order, which is exactly what the law forbids. *Equinox Software Sys., Inc. v. Airgas, Inc.*, No. 96-3399, 1997 WL 12133 at * 3 (E.D. Pa. Jan. 7, 1997) (*citing McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949)). The IEEE knew full well that it was not allowed to remove Dr. Xi from the pending RAS President in the

immediate aftermath of this Court issuing the injunction.  *See* Dkt. # 18.  The IEEE knew full well that it was forbidden from removing Dr. Xi from the RAS Presidency when it argued for a $1,000,000 bond on these exact same grounds.  *See, e.g.*, Dkt. # 26, at 56-57; Dkt. # 20, at 3-4, 8; Dkt. # 25, at 2-3.  The IEEE knew full well it was forbidden from removing Dr. Xi from the RAS Presidency when it filed an "emergency" motion to dissolve the injunction, stating that it needed emergent relief so that it could remove Dr. Xi from the RAS Presidency.  *See* Dkt. # 55, at 9.

And the IEEE knew full well that it was forbidden from removing Dr. Xi from the RAS Presidency in March 2018, when it began its experiment with disobedience of this Court's injunction. The IEEE proceeded at its peril, wagering that a conviction of Dr. Xi would justify its overhasty actions in hindsight.  But the IEEE was wrong — the Government dropped all charges against Dr. Xi, and there is nothing to excuse the IEEE's "creative" reinterpretation of the history of this case and the meaning of an injunction that everyone (including the IEEE) understood to mean preventing the very action the IEEE eventually took.

## <u>CONCLUSION</u>

This Court should hold the IEEE in contempt and issue such just and appropriate sanctions as it sees fit.

Respectfully submitted,

*/s/Christopher J. Dalton*
Christopher J. Dalton
BUCHANAN INGERSOLL & ROONEY PC
Incorporated in Pennsylvania
550 Broad Street, Suite 810
Newark, NJ 07102
(973) 273-9800
christopher.dalton@bipc.com

-and-

Joseph G. Vernon (admitted *pro hac vice*)
Jeffrey A. Crapko (admitted *pro hac vice*)
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson Avenue, Suite 2500
Detroit, MI  48226
(313) 963-6420
vernon@millercanfield.com
crapko@millercanfield.com

*Attorneys for Plaintiff*

Dated:   November 30, 2020